UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
LISA PISAPIA,

                              **MEMORANDUM AND ORDER**

          Plaintiff,                    15-CV-6039 (RRM)

          - against -

COMMISSIONER OF SOCIAL SECURITY,

          Defendant.
------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

       Plaintiff Lisa Pisapia brings this action against defendant, the Acting Commissioner of

the Social Security Administration (the "Commissioner"), seeking review of the Commissioner's

determination that Pisapia is not entitled to Disability Insurance Benefits ("DIB") or

Supplemental Security Income ("SSI") benefits, pursuant to 42 U.S.C. § 405(g).  (Compl. (Doc.

No. 1).)  Pisapia requests that this Court remand the proceedings on the grounds that the

Commissioner's decision is not supported by substantial evidence, and that the Commissioner

did not properly apply the relevant legal standard.  (Pl.'s Mem. (Doc. No. 12) at 11.)  Pisapia and

the Commissioner have cross-moved for judgment on the pleadings pursuant to Federal Rule of

Civil Procedure 12(c).  (Pl.'s Mot. J. Pls. (Doc. No. 11); Def.'s Cross-Mot. J. Pls. (Doc. No. 13).)

For the reasons set forth below, the Commissioner's motion is granted, and Pisapia's motion is

denied.

## BACKGROUND

### I.      Procedural History

       On May 2, 2012, Pisapia filed applications for both DIB and SSI, alleging disability as of

September 30, 2007 due to memory loss, depression, anxiety, reduced hearing on the right,

limited mobility on the left, and chronic pain.  (Admin. R. (Doc. No. 15) at 180–85, 186–89,

209.)  Pisapia's applications were denied concurrently.  (*Id.* at 88–95.)  The Notice of Disapproved Claim states that "the reports did not show any conditions of a nature that would prevent [Pisapia] from working.  We realize that at present [Pisapia is] unable to perform certain kinds of work.  But based on [her] age of 32 years, [her] education of 16 years, and [her] experience, [she] can perform sedentary work . . . ."  (*Id.* at 92.)  In response to this decision, Pisapia requested a hearing before an Administrative Law Judge ("ALJ").  (*Id.* at 96–97.)

On May 8, 2014, Pisapia appeared with her attorney before ALJ Joani Sedaca.  (*Id.* at 27–78.)  In a decision dated July 29, 2014, the ALJ determined that Pisapia was not disabled.  (*Id.* at 8–24.)  The ALJ determined that although Pisapia suffered from the following severe impairments – dysthymia, borderline personality disorder, substance abuse disorder, obesity, lumbar degenerative disc disease, and cervical degenerative disc disease – and although Pisapia was unable to perform her previous work due to her impairments, "the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (*Id.* at 13, 19.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Pisapia's request for review on September 25, 2015.  (*Id.* at 1–4.)

On October 20, 2015, Pisapia filed the instant action, alleging that the ALJ's decision was "not supported by substantial evidence and [was] contrary to law." (Compl. at 1–2.)  Both Pisapia and the Commissioner have filed motions for judgment on the pleadings.  (Pl.'s Mot. J. Pls.; Def.'s Cross-Mot. J. Pls.)

## II.    Administrative Record

### a.    Non-Medical Evidence

Pisapia was born in 1980 and has a bachelor's degree in English.  (Admin. R. at 37, 40.)
She worked as a school teacher from 2002–03, an activity coordinator at a rehabilitation facility
from 2003–04, a teacher's aid from 2004–05, and a job coach for people with developmental
disabilities from 2006–07.  (*Id.* at 250, 44–48.)  The job coach position involved driving to
clients' workplaces to "check up on them" and filling out progress notes.  (*Id.* at 46.)  Pisapia
testified that she stopped working in September of 2007, when she learned that her employer was
"going to fire [her] because [she] was absent so much from being in pain."  (*Id.* at 44.)  Pisapia
had been calling in sick due to pain in her back, right leg, and neck, which she believes may stem
from a childhood fall down the stairs.  (*Id.* at 45.)  She reported that in 2003, her teaching job
also ended because of conflicts with her employer regarding calling out sick.  (*Id.* at 49.)  She
testified that she had not looked for work since 2007, because she believed any prospective
employer would ultimately seek to fire her for the same reasons.  (*Id.* at 50.)

In a Function Report dated July 16, 2012, Pisapia stated that she lived with family.  (*Id.* at
215.)  Every day, she fed, showered, and otherwise cared for her son, fed and showered herself,
performed very light cleaning, and rested.  (*Id.* at 216.)  She took her son to school, helped him
with his homework, and, despite pain, cooked and did laundry.  (*Id.*)  Regarding cooking, Pisapia
stated that it was very painful to stand and cut food, which sometimes prevented her from eating
at all.  (*Id.* at 217.)  She only cooked three to four times per week, preparing easy and quick
meals.  (*Id.*)  She sometimes bought premade meals, ate at relatives' houses, or ordered take-out.
(*Id.* at 217–18.)  Pisapia stated that her father helped feed her son when she was incapable.  (*Id.*
at 216.)  Regarding her son, she also stated that she experienced pain when tying his shoe laces

for him.  (*Id.*)  In general, she stated that she was not able to sleep through the night due to muscle spasms.  (*Id.*)

Regarding personal care, Pisapia stated that she had to sit down while dressing and showering.  (*Id.*)  She experienced pain when wearing sneakers, and extreme pain when putting on a bra.  (*Id.*)  She took a very long time to bathe, and felt pain in her arms afterwards.  (*Id.*)  Some days, she did not shower at all due to pain.  It was painful for Pisapia to brush her hair, and she could not style it to the extent that she used to.  (*Id.* at 216.)  It was also painful for Pisapia to sit on the toilet, and she was not always able to reach around to wipe herself.  (*Id.* at 217.)

Regarding housework, Pisapia stated that she dusted and mopped once per month.  (*Id.* at 218.)  Despite pain, she vacuumed and did laundry once per week.  (*Id.*)  She sometimes had her laundry sent out, and received help from her son with vacuuming and dusting.  (*Id.*)  Housework was exhausting and painful for her, and she performed it very rarely.  (*Id.*)

Pisapia stated that she left the house almost every day, but not when she was unable to move the left side of her body.  (*Id.*)  She was unable to walk more than two blocks without pain, and could not use public transportation due to agora and claustra phobia.  (*Id.*)  Walking was awkward due to her lack of balance.  (*Id.* at 221.)  She later stated she could walk only one block before needing to rest for ten minutes.  (*Id.* at 222.)  She was able to drive, ride in a car, and go out alone if necessary.  (*Id.* at 218.)  She walked with a cane when in pain.  (*Id.*)

Regarding shopping, Pisapia stated that she shopped for groceries once per week, and shopped for clothes once per month.  (*Id.* at 219.)  She sometimes opted to have groceries delivered.  (*Id.*)  She was capable of paying bills and counting change, but she experienced pain in her left hand when handling money.  (*Id.*)

Regarding social life, Pisapia stated that she conversed with friends about once per week over the phone, attended church, and visited her aunt who lived next door. (*Id.*) She reported that she had problems getting along with family and friends, and felt people viewed her as a burden. (*Id.*)

Regarding her physical abilities, Pisapia stated that she was not able to lift over ten to fifteen pounds, but was able to lift and hold an infant. (*Id.*) She often lost balance when standing, and needed to lean on something. (*Id.*) When sitting, she needed to sit in an extremely comfortable chair, with her feet up. (*Id.* at 221.) When climbing stairs, she would need to hold onto railings, or sometimes crawl. (*Id.*) Kneeling and squatting were both impossible. (*Id.*) She could barely reach upward due to weakness and fatigue and could barely use her left hand. (*Id.*) She had blurred vision, 75% deafness in her right ear, and a cracked voice due to pain. (*Id.*) She had problems paying attention, was unable to finish what she started, and sometimes needed to hear or read instructions repeatedly. (*Id.* at 222.) She suffered from extremely short term memory, and would become "crippled" in response to stress. (*Id.* at 223.)

Pisapia stated that her back pain began in 2004, and began to affect her activities in 2007. (*Id.*) She experienced burning, itching, sensitive skin, sweating, swelling, tenderness to touch, loss of motion and function of the left hand, muscle spasms, and left-side paralysis. (*Id.* at 223–24.) The pain, which occurred daily, was located in her left wrist, elbow, shoulder, pelvis, hip, knee, shin, ankle, top of foot, and toes, and spread to her right side and up her spine and neck.

(*Id.* at 224.)  She took Percocet,[1] Neurontin,[2] and Soma[3] for the pain, which caused side effects including fatigue, loss of balance, blurred vision, and impaired concentration.  (*Id.* at 224–25.)

Regarding anxiety, Pisapia stated that she believed she had been anxious all her life, but that it worsened since 2005.  (*Id.* at 225.)  She experienced sweating, racing thoughts, a need to flee, rapid heartbeat, fear, and self-consciousness.  (*Id.* at 226.)  This was triggered by her brother, her mother, being in public, certain memories, worry about money, enclosed spaces, and crowds.  (*Id.*)  Anxiety rendered Pisapia incapacitated, and racing thoughts lasted for several hours.  (*Id.*).

Pisapia's father, Peter Lubrano, Sr., completed a third party function report dated February 2, 2017.  (*Id.* at 241–48.)  Lubrano reported that Pisapia could not stand, walk, or sit for long periods of time; that she got tired from doing activities that did not previously make her tired; that she could not concentrate; and that she had severe anxiety.  (*Id.* at 241.)  He reported that Pisapia took care of her child, including showering him, feeding him, and "everything a seven-year-old child requires."  (*Id.* at 242.)  Regarding personal care, he stated that Pisapia struggled to put on a bra, used a shower chair, required reminders to take her medicine, could not care for her hair as she used to, struggled to cut things, and struggled to wipe herself after using the toilet.  (*Id.*)  She sometimes was not able to shower due to pain.  (*Id.* at 243.)  Three to five

---

[1] Percocet contains a combination of two pain relievers: oxycodone, an opioid, and acetaminophen (Tylenol). DRUGS.COM, https://www.drugs.com/percocet.html (last visited September 24, 2017).  Percocet is used to relieve moderate to severe pain.  *Id.*

[2] Neurontin (gabapentin) is an anticonvulsant medication, used to treat nerve pain in adults.  DRUGS.COM, https://www.drugs.com/neurontin.html (last visited September 24, 2017).

[3] Soma, sold also under the generic name carisoprodol, is a muscle relaxer that works by blocking pain sensations between the nerves and the brain.  DRUGS.COM, https://www.drugs.com/soma.html (last visited September 24, 2017).  Soma is used together with rest and physical therapy to treat injuries and other painful musculoskeletal conditions.  *Id.*

days per week, Pisapia prepared sandwiches, cereal, yogurt, and other simple meals that did not require her to stand for long.  (*Id.*)

Lubrano reported that Pisapia's son assisted with cleaning, and that Pisapia required help with dusting, reaching, and carrying the vacuum.  (*Id.*)  He stated that Pisapia "simply [could not] use the left side of her body."  (*Id.* at 243.)  He reported that Pisapia went out every day, but not when she was in severe pain or depressed.  (*Id.* at 244.)  Although her son went with her everywhere, she could, if necessary, go out alone.  (*Id.*)  She was able to walk, drive, or ride in a car.  (*Id.*)  He reported that Pisapia shopped for clothes once a month, and food "for an hour each time."  (*Id.*)  She was able to pay bills, count change, and use a checkbook, but, due to lack of funds, could not handle a savings account.  (*Id.*)

Lubrano reported that Pisapia watched television, read to her son, and went on the computer every day.  (*Id.* at 245.)  But her wrist hurt after using the computer.  (*Id.*)  He stated that she was less active than she used to be, but that she went to church once per week, and talked with friends three times per week.  (*Id.*)  She did not need to be reminded to go places, but she did not get invited to things as others saw her as a physical and financial burden.  (*Id.*)  He reported that Pisapia's conditions affected her ability to lift more than ten pounds, squat, bend, stand, reach, walk more than one block without rest, sit, kneel, hear in her right ear, climb stairs, see, remember, complete tasks, concentrate longer than five to ten minutes, understand, follow instructions, use hands, and get along with others due to anger issues.  (*Id.* at 246.)  He reported that she sometimes finished what she started, and that she got along with authority figures.  (*Id.* at 246–47.)

Lubrano reported that Pisapia had never been fired from a job due to problems getting along with others, but that she had been fired as a result of too many absences due to pain and

immobility.  (*Id.* at 247.)  She did not handle changes in routine or stress well, and she overate, had anger issues, and feared she would end up severely disabled.  (*Id.*)  She used a cane, wristband, and glasses, and she took: Percocet, which caused constipation; Klonopin,[4] which caused fatigue; and Zoloft,[5] which caused "sex difficulties."  (*Id.* at 247–48.)  He added that he had seen a significant change in Pisapia since her disability onset.  (*Id.* at 248.)  She used to be very active, but now was very limited.  (*Id.*)  She was depressed and felt completely helpless.  (*Id.*)

Pisapia testified before ALJ Joani Sedaca on May 8, 2014.  (*Id.* at 27–78.)  At the hearing, Pisapia amended her disability onset date to January 1, 2011.  (*Id.* at 42.)  She testified that she lived with her eight-and-a-half-year-old son and father.  (*Id.* at 39.)  She struggled getting up the two flights of stairs in the house, even while using her cane, holding the bannisters, and sometimes crawling.  (*Id.*)  She reported that she could read, write, add, and subtract.  (*Id.* at 40.)  She had a driver's license but claimed that she had not driven in the last year or two, following a car accident.  (*Id.* at 40–41.)

Pisapia testified that she was unable to work because of chronic pain in her lower back, neck, feet, hands, and knee, and severe panic attacks.  (*Id.* at 46, 50.)  The panic attacks caused Pisapia to sweat, caused her heart to pound, and made her feel as if she was going to pass out,

---

[4] Klonopin (clonazepine) is a benzodiazepine used to treat panic disorder (including agoraphobia) in adults. DRUGS.COM, https://www.drugs.com/klonopin.html (last visited September 24, 2017).

[5] Zoloft (sertraline) is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs).  DRUGS.COM, https://www.drugs.com/zoloft.html (last visited September 24, 2017).  It is used to treat depression, panic disorder, anxiety, disorders, post-traumatic stress disorder, and premenstrual dysphoric disorder, among other psychiatric illnesses.  *Id.*

although she never had. (*Id.* at 50–51.) She took Prozac[6] and Xanax[7] for the anxiety and testified that they did not cause any side effects that she could think of. (*Id.* at 51.) She also took Percocet, Neurontin, and Gabapentin.[8] (*Id.* at 53–54.) She had never been hospitalized overnight for any reason, and surgery had never been recommended to her. (*Id.* at 51–52.) Pisapia also testified that she could not hear out of her right ear, and had to lip read to hear people situated on her right side. (*Id.* at 52.) She claimed that she was supposed to be fitted for a hearing aid, but could not afford it. (*Id.* at 59–60.) Her attorney declined the opportunity to obtain those medical records, explaining that, since Pisapia can communicate in one ear, they would not affect the case. (*Id.* at 60.) Pisapia testified that she could see with her glasses. (*Id.*)

Regarding personal care, Pisapia testified that her back and right leg hurt when she took showers, and that she was able to do her own hair, with difficulty. (*Id.* at 54.) She was able to do small amounts of laundry. (*Id.* at 55.) Every day, she walked across the street to drop off and pick up her son from school. (*Id.*) When grocery shopping, her uncle or another person would drive her to the store and assist her with the bags. (*Id.* at 56.) She would cook meals for her son that took only ten or fifteen minutes to prepare. (*Id.*) Pisapia testified that neither her father nor anyone else assisted her with childcare. (*Id.* at 62–63.) She spent her free time with her son, playing board and video games, reading to each other, and looking at pictures. (*Id.* at 56.) Every couple of months, a friend would take them to the movies. (*Id.* at 57.) Pisapia would get a ride from a friend to her son's baseball games. (*Id.*) She testified that she was not able to use public

---

[6] Prozac (fluoxetine) is a selective serotonin reuptake inhibitors (SSRI) antidepressant. DRUGS.COM, https://www.drugs.com/prozac.html (last visited September 24, 2017). Prozac is used to treat, among others, panic disorder and major depressive disorder. *Id.*

[7] Xanax (alprazolam) is a benzodiazepine. DRUGS.COM, https://www.drugs.com/xanax.html (last visited September 24, 2017). It is used to treat anxiety disorders, panic disorders, and anxiety caused by depression. *Id.*

[8] Gabapentin is an anticonvulsant medication, also used to treat nerve pain in adults. DRUGS.COM, https://www.drugs.com/gabapentin.html (last visited September 24, 2017).

transportation because of anxiety, and could not remember the last time she did so.  (*Id.* at 57–58.)

Pisapia testified that she regularly went to the local laundromat to wash her clothing, lifting a laundry bag of about five pounds, and taking it in a wagon to the laundromat one block away.  (*Id.* at 61.)  She stated that she had no problem moving her legs or arms, including reaching overhead.  (*Id.*)  She stated that she could probably stand for ten minutes before needing to sit, and sit for twenty minutes before needing to stand, due to lower back and neck pain.  (*Id.* at 63–64.)  She could walk two blocks maximum before needing to rest, and lift five pounds maximum.  (*Id.* at 64.)  She also stated that she had trouble sleeping due to panic attacks, which would cause her to wake up, gasping for air.  (*Id.* at 62.)

### b.  Medical Evidence Prior to Plaintiff's Amended Alleged Onset Date of January 1, 2011.

#### i.  Carmine A. De Santo, D.C., Chiropractor – July 2007

On July 27, 2007 and July 30, 2007, Carmine A. De Santo, D.C., a chiropractor, treated Pisapia for severe lower back and leg pain.  (*Id.* at 261–63.)  Dr. De Santo diagnosed lumbosacral radiculitis, resulting in sciatica in the lower right extremity.  (*Id.*)  She conducted chiropractic manipulation treatment on Pisapia during these two visits.  (*Id.*)  Dr. De Santo stated that Pisapia's prognosis was good, if she continued with treatment twice per week.  (*Id.*)  However, Pisapia did not return for care and did not return phone calls after the second appointment.  (*Id.*)

#### ii.  Lourdes P. Esteban, M.D., Neurologist – September 2009

On September 9, 2009, Lourdes P. Esteban, M.D., a neurologist, examined Pisapia for complaints of chronic low back pain.  (*Id.* at 525.)  Pisapia reported that she had hip pain on her right side as if she were being smashed with a hammer, and which radiated down both

extremities, with associated weakness, numbness, and tingling. (*Id*.) Pisapia reported difficulty walking, and experienced intensified pain when sitting, walking, and standing for prolonged periods. (*Id.*) Dr. Esteban noted that Pisapia had significant sciatica, but did not appear to be in acute distress. (*Id.*)

Pisapia exhibited tenderness in her cervical, thoracic, and lumbosacral spine. (*Id.*) She had discomfort with movement in all planes in her cervical and lumbosacral spine. (*Id.*) But there were no spasms or limitations of movement. (*Id.*) Dr. Esteban found that Pisapia had clinical evidence of a cervical-thoracic-lumbar myofascial sprain, and that her depression and anxiety magnified her symptoms. (*Id.* at 526.) Dr. Esteban referred Pisapia for an MRI of her spine, an x-ray of her right knee, and physical therapy. (*Id*.) Dr. Esteban advised Pisapia to: lose weight; avoid pushing, pulling, lifting heavy objects, or bending over; conduct home exercises; and consult a psychiatrist or psychologist. (*Id*.)

On September 14, 2009, Pisapia underwent an MRI of the cervical spine. (*Id.* at 558.) The report showed disk herniations at C4-C5, C5-C6, C6-C7, and C7-T1, without cord compression. (*Id.* at 559.)

Pisapia also underwent an MRI of the lumbar spine on September 14, 2009. (*Id.* at 563– 64.) There was a left paracentral disk herniation superimposed upon a degenerative disk bulge at L5-S1, with mass-effect upon the descending left S1 nerve root. (*Id.* at 564.) There was disk space narrowing, and foraminal stenosis, left greater than right. (*Id.*) There was a mild central disk protrusion and posterior annular tear at L4-L5, and a mild right paracentral disk herniation at L1-L2. (*Id.*) There were mild lower thoracic disk protrusions, without spinal canal stenosis. (*Id.*)

Pisapia underwent an x-ray of her right knee on September 14, 2009, which revealed a

small dorsal patellar spur inferiorly.  (*Id.* at 206.)

### iii.  Howard Baum, M.D., Orthopedist – March 2010

On March 8, 2010, Pisapia presented to Howard Baum, M.D., an orthopedic surgeon,

with complaints of stinging pain in her lower back, which radiated to her right lower extremity.

(*Id.* at 265.)  Upon examination, there were spasms, guarding, and tenderness to the spine,

guarded motion in all planes, and reaching to two-thirds of normal motion in all planes.  (*Id.*)

Pisapia had full motor strength (5/5).  (*Id.*)  Dr. Baum administered three trigger point injections

to her lower spine.  (*Id.*)  He assessed multi-level lumbar disc herniations.  (*Id.*)  He

recommended follow up for an updated MRI, an EMG study of the lower extremities, and a pain

management consult.  (*Id.*)

On March 12, 2010, Dr. Baum ordered nerve conduction studies for Pisapia.  (*Id.* at 266–

69.)  The studies revealed an unobtainable H reflex on the left, and a moderately prolonged H

reflex latency on the right.  (*Id.* at 268.)  Dr. Baum stated that the results were suggestive of a

more proximal neuropathic process at or about the root level, as observed in cases of S1

radiculopathy.  (*Id.*)

### c.  Medical Evidence After Plaintiff's Amended Alleged Onset Date of January 1, 2011.

### i.  Brooklyn Harbor Healthcare System – October 2011

Pisapia received diagnostic tests at Brooklyn Harbor Healthcare System on October 4,

2011, following a slip and fall.  (*Id.* at 541–50.)  Her brain CT scan was unremarkable.  (*Id.* at

541.)  An x-ray of her cervical spine showed no acute pathology.  (*Id.* at 542.)  An x-ray of her

left knee showed no gross fracture or dislocation, and minimal degenerative changes within the

lateral tibiofemoral compartment.  (*Id.* at 543.)  Her lumbar spine x-ray showed no acute bone

pathology, but did show mild retrolisthesis at L5-S1, thoracolumbar spondylosis, and degenerative disk disease, most pronounced at L5-S1. (*Id.* at 544.) X-rays of her left ankle and left wrist showed no evidence of acute fractures. (*Id.* at 545–46.) An x-ray of Pisapia's left hip was suggestive of sacroiliitis, possibly related to an inflammatory arthropathy. (*Id.* at 547–48.)

### ii. John Lazzara, D.O. – February 2012–April 2014

Since March 3, 2009, John Lazzara, a doctor of osteopathic medicine, saw Pisapia on a monthly basis as her treating physician. (*Id.* at 276.) From February 23, 2012 through October 22, 2013, Pisapia saw Dr. Lazzara more than twenty-five times, scheduling appointments for acute issues, medication refills, or to conduct laboratory testing for diagnoses of back pain, (*id.* at 433, 439, 440, 444, 446, 448, 450, 452, 454, 456, 458, 460, 462, 468, 470, 472, 474, 476, 478, 480, 482, 486), fibromyalgia, (*id.* at 433, 439, 440, 444, 446, 452, 454), upper respiratory issues (*id.* at 435, 448, 464, 466–67), a sprained foot, (*id.* at 484), and depression with anxiety (*id.* at 433).

In a disability report dated May 31, 2012, Dr. Lazzara noted diagnoses of back pain and muscle disorder. (*Id.* at 276–280, 277.) He noted that the back pain was severe, and that pain management treatment had produced no sign of relief for Pisapia. (*Id.* at 276.) He wrote that Pisapia also suffered from severe depression, and continued to present with dizziness and giddiness. (*Id.* at 277.) In 2009, she suffered from acute dystonia and generalized myalgia. (*Id.*) In 2010, she suffered from panic attacks, back pain, bilateral leg pain, and shock in the left leg. (*Id.*) In May of 2010, Pisapia underwent physical therapy with electrostimulation, which was "no help." (*Id.*) In July of 2010, Pisapia's panic attacks worsened. (*Id.*) She continued to come in monthly with pain, depression, and general malaise. (*Id.*) In July of 2011, she was coughing continuously. (*Id.*) In December of 2011, she was seen for severe pain on the left side of her

body, twitching of the left leg, and numbness of the foot. (*Id.*) Dr. Lazzara noted that there had been no improvements this year. (*Id.*) Dr. Lazzara prescribed Soma, Gabapentin, Zoloft, Klonopin, and Percocet. (*Id.* at 277.) Dr. Lazzara's prognosis was guarded, and he stated that the expected duration of Pisapia's condition was unknown. (*Id.*) He opined that Pisapia could only lift and/or carry one-half pound, stand and/or walk for less than two hours per day, sit for less than six hours per day, and was limited in pushing and pulling. (*Id.* at 279.) He further claimed she had postural and environmental limitations without specification. (*Id.*)

On December 4, 2013, Dr. Lazzara wrote a letter to the State Division of Disability Determination, stating that Pisapia "continue[d] to be disabled and unable to work." (*Id.* at 519.)

On January 4, 2014, Dr. Lazzara filled out a medical assessment, in which he opined that Pisapia could frequently lift and/or carry less than ten pounds, stand and/or walk for less than two hours, would require periodic alternating between sitting and standing, and was limited in pushing and pulling in her lower extremities. (*Id.* at 522–23.) He wrote that Pisapia had fibromyalgia and severe, bilateral lower back and leg pain. (*Id.* at 524.)

An MRI of Pisapia's lumbar spine conducted on April 22, 2014 revealed: mild degenerative spondylosis at T12/L1 and L1/L2; moderate degenerative spondylosis at T11/T12; and degenerative spondylosis at L5/S1 with a left-sided disc osteophyte bulge. (*Id.* at 560–62.)

### iii. Florence Shum, D.O., Neurologist – March–April 2012

On March 21, 2012, Dr. Florence Shum provided a neurologic consultation. (*Id.* at 298–300.) She reported that Pisapia presented with extreme pain on the left side of her body, and a burning sensation in her left shoulder, elbow, hip, knee, and foot, all following a fall in the shower four months earlier. (*Id.* at 298.) Pisapia reported that the pain was getting progressively worse, and that it was sometimes difficult for her to walk. (*Id.*) Even light touch could trigger

immense pain.  (*Id.*)  She complained of blurry and double vision, headaches, and dizziness, but reported no depressed mood or insomnia.  (*Id.*)  Dr. Shum noted that Pisapia appeared to be in moderate distress and in pain.  (*Id.* at 299.)  There was restricted range of motion in her neck, the left side more than the right.  (*Id.*)  There was tenderness to palpation in the cervical paraspinals and lumbar spine.  (*Id.*)  Pisapia was unable to walk on her heels and toes, and had a slight antalgic gait on the left due to pain.  (*Id.* at 300.)  Dr. Shum recommended an EMG of both upper and lower extremities to evaluate for cervical and lumbar radiculopathy, and MRIs of the lumbar and cervical spine to evaluate for radiculopathy.  (*Id.*)  She increased Pisapia's Neurontin dosage to 300 mg.  (*Id.*)

The EMG testing took place on April 4, 2012.  (*Id.* at 302–05.)  There was reduced amplitude in the left motor nerve, but the results were otherwise unremarkable.  (*Id.* at 302.)  In general, there was no evidence of electrical instability in any muscles examined.  (*Id.*)

The lumbar and cervical spine MRIs took place on April 6, 2012.  (*Id.* at 406–12.)  Pisapia's lumbar spine MRI showed normal alignment, with the vertebral bodies normal in height.  (*Id.* at 406.)  Degenerative discogenic changes were observed at the endplates of L5-S1, and to a lesser extent at L1-L2, which was consistent with the findings of the September 14, 2009 MRI.  (*Id.*)  There was a broad bony ridge eccentric to the right at L5-S1, with facet and ligamentous hypertrophy.  (*Id.*)  This led to marked right and moderate left foraminal stenosis not significantly changed since the prior study.  (*Id.* at 406–07.)  The left-sided herniated disc was no longer demonstrated.  (*Id.* at 407.)  At T11-T12, there was a central and right paramidline herniated disc, which was slightly larger than on the prior MRI, but still without significant stenosis or cord impingement.  (*Id.* at 407.)

The cervical spine MRI showed straightening of the normal cervical lordosis, which was consistent with the prior study.  (*Id.* at 411.)  At C5-C6, there was a central and right-sided herniated disc.  (*Id.*)  The herniation was larger than the prior MRI, and was now partially extruded behind C6.  (*Id.*)  It mildly indented the spinal cord on the right, which led to moderated to marked right foraminal stenosis.  (*Id*.)  There were small herniated discs at C4-C5 and C7-T1, without significant stenosis or cord impingement, and without significant change.  (*Id.*)

### iv.   Germaine Rowe, M.D., Pain Management Specialist – April–November 2012

On April 19, 2012, Pisapia saw Germaine N. Rowe, M.D., a pain management specialist.  (*Id.* at 530–32.)  Pisapia reported pain in her left foot, which radiated up to the shin, knee, hip, shoulder, left arm, and both sides of her neck.  (*Id*. at 530.)  She reported numbness and tingling in the upper and lower extremities, as well as burning.  (*Id.*).  She reported that her symptoms were exacerbated by walking, standing, and sitting.  (*Id.*)

Physical examination revealed that Pisapia ambulated with an essentially normal gait and station, without an assistive device.  (*Id.* at 531.)  Examination of the cervical and lumbar spine revealed tenderness to palpation and decreased range of motion.  (*Id*.)  Pisapia had pain inhibited weakness in the upper and lower extremities at about 4/5.  (*Id*.)  Deep tendon reflexes were diminished but symmetrical in the upper and lower extremities.  (*Id*.)  Dr. Rowe's diagnosis was neck pain, possible cervical radiculopathy, low back pain, and lumbar radiculopathy.  (*Id.*)  He saw no evidence of reflex sympathetic dystrophy.  (*Id.*)  Pisapia did not wish to undergo epidural spinal injections to treat her pain.  (*Id*.)  Dr. Rowe prescribed physical therapy, increased

Pisapia's Neurontin to 600 mg, and planned to prescribe the opioid Nucynta[9] following the requisite urinalysis.  (*Id.* at 531–32.)

After Pisapia reported pain and left-sided numbness and tingling with a burning sensation, an MRI of her brain was conducted on May 3, 2012, to rule out multiple sclerosis. (*Id.* at 401–02.)  The MRI was unremarkable, with no evidence of demyelinating disease.  (*Id.* at 401.)

On May 22, 2012, Pisapia saw Dr. Rowe for a follow-up visit.  (*Id.* at 533–34.)  Pisapia continued to suffer from cervical and lumbar pain and radicular symptoms, but she had not pursued the prescribed physical therapy, or the increased medication regimen that Dr. Rowe had recommended.  (*Id.* at 534.)  She reportedly had difficulty finding a physical therapist that would accept her insurance, and was in the process of changing insurance policies.  (*Id.*)  Since Pisapia tested positive for marijuana during the prior month, Dr. Rowe was unable to prescribe the Nucynta.  (*Id.*)  He repeated the toxicology screen, in hopes that he could move forward with the Nucynta prescription upon receiving the results in one week.  (*Id.*)  Dr. Rowe observed that Pisapia had some hyperesthesia and dysesthesia, which was not reported in the previous examination.  (*Id.* at 531, 534.)

On June 21, 2012, Pisapia presented to Dr. Rowe with complaints of dysesthesia in the left upper extremity.  (*Id.* at 535–37.)  Physical examination demonstrated some dysesthesia in the left upper and lower extremities on light touch.  (*Id.* at 536.)  There were no color changes, no temperature changes on palpation, and no skin or nail changes noted in the extremities.  (*Id.*) Pisapia was protective of the left upper and lower extremities, particularly the left upper

---

[9] Nucynta is an opioid pain medication.  Drugs.com, https://www.drugs.com/nucynta.html (last visited September 24, 2017).

extremity, and she had a somewhat decreased range of motion of the left hand. (*Id.*) Dr. Rowe found that Pisapia had cervical herniation and lumbar stenosis, but her neurologist also diagnosed her with reflex sympathetic dystrophy syndrome. (*Id.*) Dr. Rowe recommended a triple phase bone scan for further evaluation, a left stellate ganglion block, and left sympathetic nerve block. (*Id.*) Dr. Rowe started Pisapia on Nucynta 50mg a maximum of twice per day, and Lyrica[10] 75mg twice per day. (*Id.* at 537.)

A bone scan of Pisapia's entire body conducted on November 16, 2012 did not suggest reflex sympathetic dystrophy or chronic regional pain syndrome. (*Id.* at 414–15.) Findings did suggest extensive degenerative disease, and the image pattern was suspicious for cross fused ectopia on the right side. (*Id.* at 415.)

### v. Arbor WeCare – May–August 2012

On May 23, 2012, Arbor WeCare completed a biopsychosocial assessment of Pisapia. (*Id.* at 340–67.) In the medical case manager's view, over the past two weeks, Pisapia felt down, depressed or hopeless on several days, and had sleep difficulties, fatigue, and trouble concentrating nearly every day. (*Id.*) She opined that it was somewhat difficult for Pisapia to do her work, take care of things at home, or get along with other people. (*Id.*)

Pisapia stated that she had no current or past history of alcohol or substance abuse. (*Id.* at 345.) She stated that she had a history of emotional abuse. (*Id.* at 346.) She stated that she spent the day caring for her son and keeping scheduled appointments, and that she enjoyed reading. (*Id.*) She stated that she had contact with friends. (*Id.*) Pisapia reported that she may suffer from multiple sclerosis, and had chronic pain from her neck and down the left side of her

---

[10] Lyrica is an anticonvulsant, used to treat fibromyalgia, pain, and other similar symptoms. Drugs.com, https://www.drugs.com/lyrica.html (last visited September 24, 2017).

body, loss of concentration, dizziness, limited mobility, and paralysis on the left side of her body. (*Id.* at 347.)  She reportedly walked with a cane and wore a brace on her left wrist.  (*Id.*)

Pisapia was examined by Dr. Rudrama Duggrala, a physician.  (*Id.* at 348–52.)  Dr. Duggrala concluded that, during an eight-hour work day, Pisapia could only sit for one hour, could stand or walk for zero hours, could pull for less than one hour, could climb, bend, or kneel for zero hours, and could reach or grasp for 1–3 hours.  (*Id.* at 352.)  She could lift, carry, or push twenty pounds maximum.  (*Id.*)

On review of Dr. Duggrala's assessment, another physician, Dr. Loretta Greenidge-Patton, concluded that Pisapia was temporarily unemployable.  (*Id.* at 354.)  She diagnosed her with abnormal glucose, pure hyperglycendemia, depressive disorder, agoraphobia with panic disorder, morbid obesity, cervicalgia, otherwise unspecified back disorders, and limb pain.  (*Id.*)  She determined that depression, anxiety, and left-sided pain and weakness were the diagnoses affecting Pisapia's employment.  (*Id.* at 355.)

Arbor WeCare ordered urinalysis and bloodwork that was performed on May 25, 2012. (*Id.* at 370–71.)  Pisapia's hematocrit, glucose-serum, and triglycerides were flagged as abnormal.  (*Id.*)

On August 22, 2012, Pisapia had a re-examination wellness study at Arbor WeCare, performed by Dr. Eddy Cadet.  (*Id.* at 356–67.)  Pisapia did not need travel accommodation as she was able to travel on her own.  (*Id.* at 366.)  Dr. Cadet concluded that Pisapia was unable to work, for the same reasons as stated in the previous wellness study.  (*Id.*)  He also added a diagnoses of posttraumatic stress disorder to Pisapia's chart on October 23, 2012.  (*Id.* at 365.)

### vi. Susie Chow, D.O., Consultative Examiner, Internal Medicine – July 2012

On July 24, 2012, Dr. Susie Chow performed an internal medicine consultative examination of Pisapia. (*Id.* at 315–21.) Pisapia reported that her chief complaints were the symptoms stemming from her fall in the shower in October 2011. (*Id.* at 315.) These included paralysis, burning, itching pain, and sensitivity to touch, all on the left side of the body. (*Id.*) She reported dropping objects with her left hand. (*Id.*) Pisapia reported performing activities of daily living including cooking, cleaning, shopping, and child care. (*Id.* at 316.)

Upon examination, Pisapia appeared to be in no acute distress, but her gait was slow. (*Id.*) Her stance was normal, but she could not squat. (*Id.*) Pisapia reported that, for reassurance, she used a cane to climb stairs. (*Id.*) Her cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. (*Id.* at 317.) Pisapia cried and complained of pain during the seated straight leg raise on the left side, which was 70 degrees. (*Id.*) The standing straight leg raise was zero degrees on the left. (*Id.*) On the left side, Pisapia's shoulder abduction was ninety degrees, with complaint of pain, and her shoulder adduction was ten degrees. (*Id.*) Her left elbow and wrist had limited range of motion, with complaint of pain, but her right elbow, wrist, forearm, hip, knee, and ankle had full range of motion. (*Id.*) There were no evident subluxations, contractures, ankylosis, or thickening. (*Id.*) Her joints were stable and non-tender. (*Id.*) There was no evidence of redness, heat, swelling, or effusion. (*Id.*)

Pisapia had full strength in her right upper extremity. (*Id.* at 318.) But, crying, she refused to allow her left arm to be tested for strength because of pain. (*Id.*) Her hand and finger dexterity were intact. (*Id.* at 318.) Her grip strength was 2/5 in the left hand, but she was complaining of pain and crying. (*Id.*) She had full grip strength in the right hand. (*Id.*) She was

able to zip, button, and tie.  (*Id*.)  Dr. Chow wrote that, "[i]t appears that some of the symptoms

could be exaggerated."  (*Id*.)  She assessed left arm and left leg pain, a psychiatric condition,

history of cesarean section, and obesity.  (*Id*.)  She opined that Pisapia had mild limitations

regarding her ability to lift, carry, stand, walk, and climb stairs.  (*Id*.)  Her prognosis was fair.

(*Id*.)

### vii.  Michael Kushner, Ph.D., Consultative Examiner, Psychiatry – July 2012

On July 24, 2012, psychologist Michael Kushner, Ph.D., conducted a consultative

psychiatric evaluation.  (*Id*. at 309–13.)  Pisapia reported that when she was in crowds of people,

she experienced panic symptoms, including palpitations, dizziness, and fear that she would pass

out.  (*Id*. at 310.)  Upon examination, Pisapia was cooperative and responsive to questions.  (*Id*.

at 311.)  Her manner of relating, social skills, and overall presentation were fair, but her motor

behavior was somewhat stiff.  (*Id*.)  Her thought processes were coherent and goal-directed, with

no evidence of hallucinations, delusions, or paranoia.  (*Id*.)  Her intellectual functioning was

average.  (*Id*.)  Pisapia's attention, concentration, and memory skills were mildly impaired.  (*Id*.)

Her insight and judgment were good.  (*Id*. at 312.)

Pisapia reported that she dressed, bathed, and groomed herself on a daily basis.  (*Id*.)  She

stated that she performed household activities such as cooking, cleaning, laundry, and shopping,

but had great difficulty doing so because of pain.  (*Id*.)  She often sent out the laundry to be done.

(*Id*.)  Pisapia reported that she managed money for her household; rarely took public

transportation; socialized to some degree; and spent her days with her seven-year old son.  (*Id*.)

Dr. Kushner opined that Pisapia could follow and understand simple directions and

instructions, and perform simple tasks independently.  (*Id*.)  But her ability to concentrate was

mildly impaired.  (*Id*.)  She could maintain a regular schedule, learn new tasks, perform complex

tasks independently, and make appropriate decisions.  (*Id*.)  But her ability to relate adequately

with others and appropriately deal with stress would likely be impaired by psychological

problems.  (*Id*.)

Dr. Kushner found that the evaluation results appeared to be consistent with psychiatric

problems that may significantly interfere with the claimant's ability to function on a daily basis.

(*Id*.)  He diagnosed Pisapia with depressive disorder and anxiety disorder, and gave a prognosis

of fair.  (*Id*. at 312–13.)

### viii.   A. Stockton, M.D., Psychiatric Consultant – September 2012

On September 11, 2012, A. Stockton, M.D., a State agency psychiatric consultant who

reviewed the evidence of record, found that Pisapia had an affective disorder (depression and

anxiety) that did not meet the criteria of Section 12.04 of the Listing of Impairments.  (*Id*. at

326–39.)

In a mental residual functional capacity assessment, Dr. Stockton opined that Pisapia had

no significant limitations with regard to her ability to: remember locations and work-like

procedures; understand and remember very short and simple instructions; understand and

remember detailed instructions; carry out very short and simple instructions; perform activities

within a schedule, maintain regular attendance, and be punctual within customary tolerances;

sustain an ordinary routine without special supervision; work in coordination with or proximity

to others without being distracted by them; make simple work related decisions; interact

appropriately with the general public; ask simple questions or request assistance; accept

instructions and respond appropriately to criticism from supervisors; get along with coworkers or

peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate

behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards

and take appropriate precautions; and travel in unfamiliar places or use public transportation. (*Id.* at 322–23.) Dr. Stockton noted a moderate limitation in the remaining categories, which consisted of Pisapia's ability to: carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. (*Id.*) No marked limitations were noted. (*Id.*)

Pisapia reported that she had never been psychiatrically hospitalized. (*Id.* at 324.) She complained of chronic pain, hearing impairment, limited mobility, chronic depression, chronic anxiety, and memory problems. (*Id.*) Dr. Stockton found Pisapia's mental state to be coherent and relevant, and found Pisapia to be cooperative. (*Id.*) Pisapia stated that she could travel alone, perform household chores as her symptoms permitted, shop, and handle money. (*Id.*) She had friends, and related well with family members. (*Id.*) Dr. Stockton determined that Pisapia had the mental residual functional capacity to sustain attention and concentration, interact appropriately with coworkers and supervisors, and adapt to changes in the work environment. (*Id.*)

### ix.  Jordana Cotton, M.D., Psychiatrist – September 2012

On September 27, 2012, Dr. Jordana Cotton, a psychiatrist, completed a treating physician's wellness plan report for Pisapia's state public assistance. (*Id.* at 368–69.) Dr. Cotton reported that Pisapia was diagnosed with post-traumatic stress disorder ("PTSD") and major depressive affective disorder, recurrent episode, moderate. (*Id.* at 368.) She observed a depressed mood, but no memory issues. (*Id.*) She confirmed that Pisapia attended scheduled

appointments, took her prescribed medication, and complied with other types of treatment. (*Id.*) She reported that Pisapia's conditions had not been resolved or stabilized. (*Id.* at 369.) Based on a review of Pisapia's chart and her own examination, Dr. Cotton concluded that Pisapia would be unable to work for at least twelve months. (*Id.*)

### x. Mapleton Clinic, Psychiatry – March 2013–April 2014

On March 14, 2013, Pisapia saw Dr. Funto M. Oluwafemi, a psychologist, for a psychiatric screening and assessment. (*Id.* at 581–87.) Pisapia reported that she had severe anxiety, social phobia, depression, OCD, borderline personality disorder, and claustrophobia. (*Id.* at 581.) She reported that her anxiety and depression stemmed from childhood sexual abuse and violent threats perpetrated by her older brother. (*Id.*) She reported that her symptoms intensified after her mother's death, seven years ago. (*Id.*) She reported that her brother had been living in the house with her, her son, and her father for six years, but moved out recently. (*Id.*). She stated that she was "living in fear" during the time that her brother was living with them. (*Id.*) Dr. Oluwafemi directed the office staff to implement Trauma Guidelines for treatment, and recommended Pisapia join the following treatment groups: Trauma, Wellness Self Management, Relaxation, and Symptom Management. (*Id.* at 585.) Pisapia was referred to a psychiatric intake assessment appointment with psychiatrist Tiffany Cummins, M.D. (*Id.* at 586.) In a note dated April 8, 2013, Dr. Guissoo Nabavian approved Pisapia's admission into Mapleton Clinic, noting that she had symptoms of depression and panic disorder. (*Id.* at 590.)

On April 8, 2013, Dr. Cummins performed an initial evaluation of Pisapia. (*Id.* at 591–596.) She noted that Pisapia planned to come to the clinic either on foot or by taking a short bus ride. (*Id.* at 591.) She noted that Pisapia exhibited depressive symptoms of low mood, low energy, poor concentration, decreased ability to enjoy things, low self-esteem, and excessive

sleeping.  (*Id.*)  She also exhibited symptoms of panic: sudden attacks of anxiety, fear of having

another attack, and associated physical sensations such as shaking and lightheadedness.  (*Id.*)

Pisapia reported that anxiety made it difficult to take the train, and that she had to sit up front in

church so as not to see all the people behind her.  (*Id.*)  In Dr. Cummins' opinion, Pisapia

exhibited various personality traits that were characteristic of borderline personality disorder

symptoms.  (*Id.*)  Pisapia denied any flashbacks associated with PTSD and her past sexual abuse.

(*Id.*)  Pisapia reported that she had a history of getting into physical fights with her boyfriend and

brother, and that her father was and is physically abusive to her.  (*Id.* at 592.)  She reported that

she was currently sleeping on the couch in her father's basement, and she was afraid her father

would kick her and her son out.  (*Id.*)  Her brother called her a "slut" and "whore" when he saw

her.  (*Id.*)

Dr. Cummins found that Pisapia's appearance was well-groomed and obese, her attitude

was cooperative, and she was smoking an electronic cigarette.  (*Id.* at 593.)  Pisapia's thought

process was linear, with no evidence of delusions.  (*Id.*)  Pisapia was able to spell a five-letter

word backwards.  (*Id.* at 594.)  Pisapia denied ideas/delusions of reference, being controlled by

an outside force, being able to read people's minds (or that someone could read her mind), and

fearing that people were spying on her or out to get her.  (*Id.*)  Pisapia stated that on two

occasions she heard a male voice warning her about future events, including that her parents

would not be around for her next birthday and that the police were coming to raid her house.

(*Id.*)  Pisapia's mood/affect was "depressed" and generally dysphoric, with some tears, and some

appropriate laughter.  (*Id.*)

Pisapia stated that she had passive suicidal ideations nightly by thinking that she might be

better off dead.  (*Id.*)  Pisapia denied any deliberate attempts to harm herself, denied having any

intent or plans to harm herself, or having made any such preparations. (*Id.*) Pisapia reported that she would never commit suicide because of the pain it would cause the survivors and she would not want to leave her son without a mother. (*Id.*) Pisapia displayed fair to good insight and fair judgment. (*Id.*) Dr. Cummins diagnosed Pisapia: on Axis I with Dysthymic Disorder and Panic Disorder with Agoraphobia; on Axis II with Personality Disorder; on Axis III with Obesity and other chronic pain; on Axis IV with other psychosocial and environmental problems, and with problems with her primary support group; and on Axis V with a current Global Assessment of Function ("GAF") score of 60.[11] (*Id.* at 594–95.) Dr. Cummins gave a fair prognosis, noting that Pisapia had been unemployed for multiple years, had conflicts with her father, and had a history of unstable relationships and physical ailments. (*Id.* at 595.) Dr. Cummins recommended psychotherapy and psychiatric medications. (*Id.*)

Dr. Bella Proskurov, a supervising psychologist, reviewed the findings from the intake and admissions assessment and synthesized a treatment plan in a note dated May 14, 2013. (*Id.* at 609–22.) She opined that when Pisapia became psychiatrically stable, she might benefit from a referral to a vocational rehabilitation program. (*Id.* at 620.)

On May 3, 2013, Pisapia saw Dr. Cummins for treatment. (*Id.* at 744–45.) Pisapia arrived by herself, on time, and reported that she felt less depressed and anxious. (*Id.* at 744.) Pisapia appeared alert, well-groomed and obese, and had a fresh pedicure. (*Id.*) Her mood and affect were better, euthymic, and bright. (*Id.*) She reported having a party for her son's first communion that her whole family enjoyed. (*Id.*) Pisapia exhibited a linear thought process with

---

[11] GAF is a rating of overall psychological functioning on a scale of 0 to 100. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994). A GAF of 51 to 60 reflects "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *Id.* In 2013, the American Psychiatric Association abandoned the GAF scale due to "conceptual lack of clarity" and "questionable psychometrics in routine practice." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013).

no evidence of delusions, denied any history of hallucinations, denied suicidal intent, plan, or preparation, but reported thinking she might be better off dead. (*Id*.) Pisapia reported that she believed the Viibryd[12] she had been prescribed was starting to have an effect, though it also made her sweaty, and she reported using Xanax less frequently. (*Id*.) She still had a lot of anxiety on public transportation, but was "push[ing] through it." (*Id.*)

Pisapia returned to Dr. Cummins on June 3, 2013. (*Id.* at 737–38.) Pisapia arrived by herself, on time, and reported that was feeling more depressed because she was feeling like a failure as a mother for not being able to pay for her son to participate in various activities. (*Id.* at 737.) Pisapia stated that she would like to get a job but did not know who would watch her son. (*Id*.) She stated that she could "suck it up" and become a teacher's aide again, despite the fact that she "hated" the work. (*Id.*) Pisapia reported that the Viibryd was no longer working, and requested that she be switched to Prozac. (*Id*.) She returned her May prescription for Xanax to Dr. Cummins, because she had been taking less Xanax, and had pills left over from March. (*Id.*) Pisapia was seen walking with a limp, her mood was depressed, and she was tearful and sad. (*Id*.) Pisapia reported that she was smoking a half-pack of cigarettes per day. (*Id.*) Her medications were Nicotine,[13] Prozac, and Xanax. (*Id.* at 738.)

On June 18, 2013, Pisapia spoke by telephone with Dr. Cummins, after Pisapia canceled her appointment in order to stay home with her sick son. (*Id.* at 734.) Pisapia reported that, after taking 10 mg of Prozac once per day, her mood had improved for the first week, but that she was

---

[12] Viibryd (vilazodone) is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs). DRUGS.COM, https://www.drugs.com/viibryd.html (last visited September 24, 2017).

[13] Nicotine is the primary ingredient in tobacco products. DRUGS.COM, https://www.drugs.com/nicotine.html (last visited September 24, 2017). Using a controlled amount of nicotine helps reduce nicotine withdrawal symptoms when one quits smoking. *Id.*

now feeling more depressed.  (*Id*.)  Dr. Cummins prescribed 20 mg of Prozac once per day, but the other prescriptions remained the same.  (*Id*.)

On July 5, 2013, Pisapia saw Dr. Cummins for treatment.  (*Id*. at 730–31.)  Pisapia arrived by herself and on time.  (*Id*. at 730.)  Pisapia reported that she was feeling better on the Prozac than she had on previous medications, but she requested a higher dosage, to which Dr. Cummins agreed.  (*Id*.)  Pisapia was still smoking a half-pack of cigarettes per day, and had not yet tried the Nicotine that was prescribed.  (*Id*.)  Dr. Cummins prescribed 40 mg of Prozac once per day, but the other prescriptions remained the same.  (*Id*. at 730–731.)

In a medical source statement dated July 5, 2013, Dr. Cummins indicated that she had seen Pisapia every two to four weeks since April 3, 2013.  (*Id*. at 569.)  She noted diagnoses of dysthymia and borderline personality disorder.  (*Id*.)  She reported that medication had improved Pisapia's mood slightly.  (*Id*.)  Pisapia was currently being prescribed 40 mg of Prozac per day and 0.25 mg of Xanax as needed.  (*Id*.)  She wrote that Pisapia did not have any side effects from medications.  (*Id*.)  She noted that Pisapia had mood lability, difficulty maintaining healthy relationships, anxiety, and was tearful at times.  (*Id*.)  Her prognosis was fair-to-good.  (*Id*.)  Dr. Cummins assessed Pisapia's GAF as 60, consistent with moderate symptoms.  (*Id*.)

Dr. Cummins identified the following signs and symptoms: anhedonia or pervasive loss of interest in almost all activities; decreased energy; thoughts of suicide; feelings of guilt or worthlessness; somatization unexplained by organic disturbance; mood disturbance, persistent disturbances of mood or affect; persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity or situation; intense and unstable interpersonal relationships and impulsive and damaging behavior; emotional lability; unrealistic interpretation of physical signs or sensations associated with the preoccupation or

belief that one has a serious disease or injury; recurrent severe pain attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; and a history of multiple physical symptoms of several years duration beginning before age 30, that have caused the individual to take medicine frequently, see a physician often, and alter life patters significantly. (*Id.* at 570.)

She opined that Pisapia was seriously limited in her abilities to: complete a normal workday and workweek without interruptions from psychologically based symptoms; deal with normal work stress; travel in unfamiliar places; use public transportation; and deal with stress of semiskilled and skilled work. (*Id.* at 571–72.) She estimated that Pisapia would be absent from work about three days per month due to her impairments. (*Id.* at 573.) Dr. Cummins opined that Pisapia's abilities in all other aspects of functioning were either "unlimited or very good" or "limited but satisfactory." (*Id.* at 571–72.) She also noted that many of Pisapia's physical pain complaints were likely manifestations of depression and anxiety. (*Id.* at 572.)

On July 19, 2013, Pisapia again saw Dr. Cummins. (*Id.* at 726–27.) Pisapia arrived by herself and on time. (*Id.* at 726.) Pisapia reported that she felt "pretty good" and had cut back her smoking to three-to-four cigarettes per day. (*Id.*) On July 23, 2016, Pisapia spoke with Dr. Cummins to cancel her upcoming appointment on August 2, 2013. (*Id.* at 724.) She stated that she was going to Connecticut with friends. (*Id.*) Pisapia requested a prescription for Xanax, which Dr. Cummins agreed to provide. (*Id.*)

On August 26, 2013, Pisapia requested an appointment with Dr. Cummins the next day. (*Id.* at 721.) On August 27, 2013, Pisapia informed Dr. Cummins that she would not be coming to her appointment because she was feeling physically sick. (*Id.*) Pisapia returned to Mapleton Clinic on September 16, 2013, and saw Dr. Bella Proskurov. (*Id.* at 718–19.) She reported that

when she was away and "had another adult around," she felt "great," did not feel depressed, and was engaged in various activities with her son.  (*Id.* at 718.)  Once she returned to Brooklyn, she felt depressed again.  (*Id.*)  Dr. Proskurov found her pleasant, animated, eager to talk, and cooperative.  (*Id.*)

On October 21, 2013, Pisapia saw Dr. Proskurov and complained of worsening arthritic pain that prevented her from ambulating freely and working with her hands.  (*Id.* at 714.)  She spent a considerable amount of time talking about her pain, in addition to a child support hearing that did not go as well as she had hoped.  (*Id.*)  Pisapia did not show up for her appointment with Dr. Proskurov on November 4, 2013, or on December 9, 2013.  (*Id.* at 713, 710.)  Dr. Proskurov did speak with Pisapia on the phone on December 9, 2013.  (*Id.* at 711.)  Pisapia stated that she was not able to take her son to school because of pain, so her son missed school.  (*Id.*)  Pisapia stated that she had spent the entire weekend, ten hours straight, decorating the house with relatives, which caused the pain.  (*Id.*)

Pisapia met with Dr. Yuriy Kheyfits, another psychiatrist, on December 17, 2013.  (*Id.* at 706–08.)  She complained of depressed mood, increased need for sleep, feeling anxious when using public transportation and shopping, and panic attacks.  (*Id.*)  Pisapia did not show up for appointments on December 20, 2013, January 14, 2014, or January 20, 2014.  (*Id.* at 705.)  On February 10, 2014, Dr. Proskurov spoke with Pisapia on the phone, who stated that she was in a lot of pain and could barely get up to take her son to school.  (*Id.* at 704.)  Dr. Proskurov scheduled appointments for February 26, 2017, which Pisapia did not show up for.  (*Id.* at 704, 03.)

Dr. Kheyfits saw Pisapia on March 12, 2014.  (*Id.* at 699–702.)  She complained of depressed and anxious mood, crying spells, erratic sleep pattern, and panic attacks at night three

to four times per week, lasting 45 minutes each.  (*Id.* at 700.)  Dr. Kheyfits reported that Pisapia had been participating in various activities and playing sports.  (*Id.*)  Pisapia also met with Dr. Proskurov that day.  (*Id.* at 697.)  She reported that she had to vacate her house in June because her father was going to sell it.  (*Id.*)  She stated that she had been selling the contents of the house in preparation and had been participating in the church-related children's sports teams. (*Id.*)

Dr. Kheyfits saw Pisapia again on April 9, 2014.  (*Id.* at 694.)  Pisapia continued to be anxious about her living situation.  (*Id.*)  She was feeling increasingly anxious in overcrowded places, and continued to have panic attacks and erratic sleep.  (*Id.*)  Pisapia also met with Dr. Proskurov that day.  (*Id.* at 693.)  Dr. Proskurov noted that Pisapia appeared dysphoric, and had been unable to make realistic plans regarding housing due to feeling overwhelmed.  (*Id.*)  Pisapia requested more frequent appointments.  (*Id.*)  She did not show for her appointment on April 22, 2014, claiming to have mixed up the appointment time.  (*Id.* at 691.)

### xi. Johari Massey, Ph.D., Consultative Examiner, Psychiatry – October 2013

On October 16, 2013, Johari Massey, Ph.D., performed a consultative psychiatric evaluation of Pisapia.  (*Id.* at 389–94.)  Pisapia took public transportation to the appointment. (*Id.* at 389.)  Pisapia complained of depression, anxiety, and extreme pain.  (*Id*.)  She reported that she was able to dress, bathe and groom herself, cook and prepare food, do general cleaning, do laundry, shop, manage money, drive and take public transportation independently.  (*Id.* at 392.)  However, she alleged that she avoided going out in public due to anxiety.  (*Id*.)  She also reported that she did "everything she need[ed] to for her son," but then had a hard time getting motivated to do anything else.  (*Id.* at 393.)  She reported that a few days prior, she thought about

committing suicide, but had no plan to do so.  (*Id.* at 390.)  She also reported that, when she was a child and a young adult, both her father and uncle had tried to kill her.  (*Id.*)

 Upon examination, Pisapia was cooperative and related in an adequate manner.  (*Id.* at 391.)  She appeared well groomed and dressed appropriately.  (*Id.*)  Her speech was fluent and clear.  (*Id.* at 392.)  Her expressive and receptive language was adequate.  (*Id.*)  Her thoughts were coherent and goal-directed, with no evidence of hallucinations or paranoia.  (*Id.*)  Her mood was dysthymic, and she was oriented to person, place, and time.  (*Id.*)  Her attention and concentration were intact.  (*Id.*)  Her recent and remote memory skills were mildly impaired.  (*Id.*)  Her cognitive function was average, and she possessed a general fund of information appropriate to her experience.  (*Id.*)  Her insight and judgment were good.  (*Id.*)

Dr. Massey diagnosed Pisapia on Axis I with major depressive disorder without psychotic features, panic disorder with agoraphobia, and posttraumatic stress disorder; deferred diagnosis on Axis II; and diagnosed Pisapia on Axis III with degenerative disc disease, arthritic sciatica, and fibromyalgia, adenomyosis, premenstrual dysphoric dysphoric disorder, and sacroiliac joint inflammation.  (*Id.* at 393–94.)  He opined that Pisapia had no limitations in her abilities to follow and understand simple directions, perform simple tasks, maintain attention and concentration, and make appropriate decisions.  (*Id.* at 393.)  She had mild-to-moderate limitations in her ability to maintain a regular schedule and was moderately limited in her abilities to relate adequately with others and appropriately deal with stress.  (*Id.*)  She was mildly limited in her abilities to learn new tasks and perform complex tasks.  (*Id.*)  Dr. Massey added that the examination results appear to be consistent with psychiatric problems, and this may significantly interfere with Pisapia's ability to function on a daily basis.  (*Id.*)  Pisapia's

prognosis was "fair given the array of physical and emotional symptoms and the lack of support." (*Id.* at 394.)

Dr. Massey completed a medical source statement dated October 20, 2013. (*Id.* at 395–97.) In it, he added that Pisapia had mild difficulty understanding and remembering complex instructions, carrying out complex instructions, and making judgments on complex work related decision. (*Id.* at 395.) He stated that Pisapia's impairments were caused by symptoms of anxiety and depression, which led to fatigue, distractibility, and lack of motivation. (*Id.*) He added that Pisapia would have moderate difficulty interacting appropriately with the public, supervisors, and co-workers, and responding appropriately to the usual work situations and to changes in a routine work setting. (*Id.* at 396.) He explained that these limitations were connected to Pisapia's diagnoses of panic disorder with agoraphobia and PTSD, which made it difficult for her to relate to other adequately, deal with stress, and manage her symptoms of anxiety when she became overwhelmed. (*Id.*) He opined that her ability to deal with stress was moderately limited. (*Id.*) Pisapia's major depressive disorder, panic disorder, and PTSD made it difficult for her to manage stress and left her easily fatigued, lacking motivation to complete tasks, and unable to cope with becoming overwhelmed. (*Id.*)

### xii. Ammaji Manyam, M.D., Consultative Examiner, Internal Medicine – October 2013

Also on October 16, 2013, Ammaji Manyam, M.D., performed a consultative examination of Pisapia. (*Id.* at 377–80.) Pisapia reported activities of daily living including cooking, cleaning, shopping, and showering. (*Id.* at 378.) Upon examination, she was in no acute distress and her gait was normal. (*Id.*) She could walk on heels and toes without difficulty. (*Id.*) She squatted two-thirds of the way down, and her stance was normal. (*Id.*) She used no assistive devices, and needed no help changing for the exam or getting on and off the

exam table. (*Id.* at 378–79.) She was able to rise from a chair without difficulty. (*Id.* at 379.) Her cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. (*Id.*) Her lumbar spine showed full flexion, extension, lateral flexion bilaterally, and rotary movement bilaterally. (*Id.*) She displayed full range of motion in the shoulders, elbows, forearms, and wrists bilaterally. (*Id.*) She had full range of motion of hips, knees, and ankles bilaterally. (*Id.*) There were no evident subluxations, contractures, ankylosis, or thickening. (*Id.*) Her joints were stable and non-tender. (*Id.*) There was no evidence of redness, heat, swelling, or effusion. (*Id.*) She had full strength (5/5) in the upper and lower extremities. (*Id.*) No muscle atrophy was evident. (*Id.* at 380.) Her hand and finger dexterity was intact and she had full grip strength (5/5) bilaterally. (*Id.*) Her prognosis was good. (*Id.*) Dr. Manyam opined that Pisapia had no limitations regarding physical activities such as prolonged standing, sitting, climbing stairs, pushing, pulling, lifting, and carrying. (*Id.*)

Dr. Manyam completed a medical source statement of Pisapia's ability to do physical work-related activities dated October 16, 2013. (*Id.* at 381–86.) Dr. Manyam reported that Pisapia could never lift and carry 51 to 100 pounds, could occasionally lift and carry 21 to 50 pounds (up to 1/3 of the work day), could frequently lift and carry 11 to 20 pounds (1/3 to 2/3 of the work day), and could continuously carry up to 10 pounds. (*Id.* at 381.) Dr. Manyam reported that Pisapia could sit and stand for up to one hour at a time, and for one hour total in an eight-hour workday. (*Id.* at 382.) Pisapia could walk without a cane, and could walk for six hours at a time, and for six hours total, in an eight-hour work day. (*Id.*) Dr. Manyan found that Pisapia could occasionally (1/3 of the work day) climb stairs and ramps, climb ladders or scaffolds, stoop, kneel, crouch, and crawl; and could continuously (over 2/3 of the time) balance herself. (*Id.* at 384.) Pisapia's impairments did not affect her hearing or vision, and Pisapia

could understand and communicate simple oral instructions.  (*Id*.)  Pisapia could occasionally (up to 1/3 of the day) tolerate unprotected heights, extreme cold, and extreme heat; and could frequently tolerate (1/3 to 2/3 of the work day) moving mechanical parts, operating a motor vehicle, humidity and wetness, dust, odors, fumes, and pulmonary irritants, vibrations, and loud noise (heavy traffic).  (*Id.* at 385.)  Dr. Manyam found that Pisapia could: go shopping; travel without a companion for assistance; ambulate without using a wheelchair, walker, or two canes or two crutches; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple meal and feed herself; care for her personal hygiene; and sort, handle, or use paper/files.  (*Id.* at 386.)

### xiii.  Christine Crisafulli-Fitzpatrick, M.D., Neurologist – December 2013

On December 5, 2013, Pisapia saw Christine Crisafulli-Fitzpatrick, M.D., a neurologist, complaining of pain and a burning sensation in her right lower back, which radiated into her right leg and foot.  (*Id.* at 554–56.)  Pisapia stated that she used marijuana daily.  (*Id.* at 554.)  Dr. Crisafulli-Fitzpatrick examined Pisapia, and found that she was well-developed, well-nourished, obese, and in no acute distress.  (*Id.* at 555.)  Pisapia's neck was supple with full range of motion, her carotids were 2+ without bruits, and there were no cranial or orbital bruits.  (*Id*.)  Pisapia had no tenderness in her spine, and her straight leg raise was negative bilaterally.  (*Id*.)  Pisapia was awake, alert, and oriented times three.  (*Id*.)  Her speech was fluent, and her memory was intact.  (*Id*.)  Pisapia's cranial nerves two through twelve were intact, and there was mild ptosis bilaterally.  (*Id*.)  Corneal reflexes and hearing were intact and facial sensations were normal.  (*Id*.)  Pisapia's gait was antalgic on the right, her deep tendon reflexes were 1+ throughout, and her plantars were downgoing bilaterally.  (*Id*.)

After reviewing Pisapia's medical records, Dr. Crisafulli-Fitzpatrick found that Pisapia had right lower back pain and leg pain, as well as chronic neck pain. (*Id.*) She recommended that Pisapia have a repeat MRI of the lumbar spine, as well as an EMG and nerve conduction studies of the right lower extremity, to determine if Pisapia should be referred to pain management and physical therapy. (*Id.* at 555–56.)

### d. Vocational Expert Testimony

Vocational Expert ("VE") Marian Green testified at the administrative hearing. (*Id.* at 66–77.) VE Green testified that Pisapia had previously worked as a Substance Abuse Counselor (DOT[14] code 045.107-058), which was skilled sedentary work. (*Id.* at 67.) She had also worked as an elementary school teacher (DOT code 092.227-010), which was skilled light work. (*Id.*) The ALJ asked the VE about a hypothetical individual who could perform sedentary work,[15] with the following limitations: occasionally climb ramps, stairs, balance, stoop, kneel, crouch; no crawling; tolerate no concentrated exposure to fumes, odors, dust, gases, or poor ventilation; climb no ladders, ropes or scaffolds; tolerate no exposure to unprotected heights, and no operation of machinery. (*Id.* at 69–72.) Furthermore, this individual was limited to only simple, routine, repetitive tasks, with only occasional changes in the work setting. (*Id.* at 72.) The individual was also limited to only minimal contact with co-workers and no contact with the public. (*Id.* at 73.) The VE testified that such an individual could work as a bench assembler (DOT code 734.687-018) with 200,000 such jobs in the national economy; jewelry preparer

---

[14] *The Dictionary of Occupational Titles* ("DOT") (4th ed., rev'd 1991) is available online at http://www.occupationalinfo.org/.

[15] By definition, "[s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). The regulation continues, "[a]lthough a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." *Id.* "Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id.*

(DOT code 700.687-062) with 50,000 such jobs in the national economy; or stone setter (DOT code 735.687-034) with 100,000 such jobs in the national economy.  (*Id.* at 74–76.)

## LEGAL STANDARD

### I.     Review of Denial of Social Security Benefits

The Court does not make an independent determination about whether a claimant is disabled when reviewing the final determination of the Commissioner.  *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Rather, the Court "may set aside the Commissioner's determination that a claimant is not disabled only if the [ALJ's] factual findings are not supported by 'substantial evidence' or if the decision is based on legal error."  *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)).  "'[S]ubstantial evidence' is 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Id.* (internal quotation marks omitted).  "If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld."  *Stemmerman v. Colvin*, No. 13-CV-241 (SLT), 2014 WL 4161964, at *6 (E.D.N.Y. Aug. 19, 2014) (citing 42 U.S.C. § 405(g)).  "This deferential standard of review does not apply, however, to the ALJ's legal conclusions."  *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010).  Rather, "[w]here an error of law has been made that might have affected the disposition of the case, [an ALJ's]

failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).

## II.      Eligibility for Disability Benefits

To qualify for DIB or SSI, an individual must show that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A) (SSI); 42 U.S.C. § 1382c(a)(3)(A) (DIB).  This requires a five-step analysis for determining whether a claimant is disabled:

> [1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

> [2] If she is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits her physical or mental ability to do basic work activities.

> [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Commissioner will consider her *per se* disabled.

> [4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work.

> [5] Finally, if the claimant is unable to perform her past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also* 20 C.F.R. §§ 404.1520, 416.920.  The claimant has the burden of proof for the first four steps of the analysis, but the burden shifts to the Commissioner for the fifth step.  *See Talavera*, 697 F.3d at 151.

**DISCUSSION**

I.    **ALJ Sedaca's Decision**

The ALJ followed the five-step analysis. (*See* Admin. R. at 11–19.) At Step One, the ALJ found that Pisapia had not engaged in substantial gainful activity since the time of her alleged onset date. (*Id.* at 13.) At Step Two, the ALJ determined that Pisapia suffered from the following severe impairments: dysthymia, borderline personality disorder, substance abuse disorder, obesity, lumbar degenerative disc disease, and cervical degenerative disc disease. (*Id.*) The ALJ also found that Pisapia had high blood pressure, but that this condition was a non-severe impairment, as Pisapia was not "receiving significant treatment" for it, and it had not created "any ongoing physical difficulty for her." (*Id.*) At Step Three, the ALJ found that Pisapia did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (*Id.* at 14.) Next, the ALJ determined that Pisapia had the residual functional capacity ("RFC") to:

> [P]erform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except, based on the claimant's allegations of pain, she can occasionally climb ramps, stairs, balance, stoop, kneel, crouch; cannot climb ladders, ropes, or scaffolds; with no exposure to unprotected heights or moving machinery, including driving; is limited to simple, routine, repetitive tasks with only occasional changes in the work setting including procedures and tools; with only occasional decision-making required; only occasional contact with co-workers; and no contact with the public.

(*Id.* at 15.) At Step Four, the ALJ found that Pisapia was unable to perform her past relevant work. (*Id.* at 18.) Finally, at Step Five, the ALJ relied on the testimony of the vocational expert to find that there were jobs that existed in the national economy that Pisapia could perform given her age, education level, and RFC. (*Id.* at 18–19.) Accordingly, the ALJ found that Pisapia was not disabled. (*Id.*)

In support of her motion for judgment on the pleadings, Pisapia argues that the ALJ erred in making the RFC determination and identifying jobs that Pisapia could hold in the national economy. (*See generally* Pl.'s Mem. at 13–17.) Specifically, Pisapia contends that the ALJ violated the "treating physician rule," and that the ALJ's RFC determination was not supported by substantial evidence. (*Id.*)

## II.     The Treating Physician Rule

Pisapia contends that the ALJ was obligated to give controlling weight to Dr. Lazzara's determination that she was unable to work at the sedentary level, citing the "treating physician rule." (Pl.'s Mem. at 13–14.) First, Pisapia asserts that Dr. Lazzara's opinion is corroborated by her lumbar and cervical spine MRIs dated September 14, 2009, her nerve conduction study dated March 12, 2010, and her cervical spine MRI dated April 6, 2012. (*Id.* at 14.) Second, Pisapia maintains that the ALJ was not justified in relying on the opinions of two consultative examiners to discount Dr. Lazzara's opinion. (*Id.*)

The "treating physician rule" is comprised of a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527, detailing the weight to be accorded a treating physician's opinion. The regulations provide: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(c)(2); *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Shaw*, 221 F.3d at 134. "Treating source," in turn, is defined as a claimant's "physician, psychologist or other acceptable medical source" who provides, or has provided, the claimant "with medical treatment

or evaluation and who has, or has had, an ongoing treatment relationship" with the claimant. 20 C.F.R. § 404.1502.

A treating physician's opinion "need not be given controlling weight where [it is] contradicted by other substantial evidence in the record." *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *see also Tricarico v. Colvin*, No. 15-CV-3786, 2017 U.S. App. LEXIS 3821, at *3 (2d Cir. Mar. 3, 2017) ("[T]he ALJ need not grant the treating physician's assessment controlling weight where the opinion is inconsistent with the other evidence in the record . . . ."). When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ] of its existence . . . and, if the [ALJ] does not credit the findings of that report, to an explanation of why it does not." *Snell*, 177 F.3d at 134.

In deciding how much to discount a treating physician's opinion, the ALJ must consider the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors that may be significant. 20 C.F.R. § 404.1527(c)(2)– (6); *see Halloran*, 362 F.3d at 32; *Shaw*, 221 F.3d at 134. "[W]here the ALJ's reasoning and adherence to the regulation are clear," the Second Circuit does not require "slavish recitation of each and every factor." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013); *see also Camille v. Colvin*, 652 F. App'x 25, 28 (2d Cir. 2016) (holding that the ALJ's failure to "describe in detail her rationale" for discounting the treating physician's opinion did not warrant remand); *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)) ("An ALJ need not recite every piece of evidence that contributed to

the decision, as long as the record 'permits us to glean the rationale of an ALJ's decision.'");

*Pilaccio v. Comm'r of the SSA*, No. 16-CV-1251 (ADS), 2017 U.S. Dist. LEXIS 99574, at *14 (E.D.N.Y. June 26, 2017) (citing *Halloran*, 362 F.3d at 31–32) (finding that the ALJ's explanation was sufficient because it addressed the consistency of the treating physician's opinion with the record as a whole).

Having treated Pisapia on a monthly basis since 2009, Dr. Lazzara qualifies as Pisapia's treating physician. *See* 20 C.F.R. § 404.1502; (Admin R. at 276.) In a report dated May 31, 2012, Dr. Lazzara reported that Pisapia could only lift and/or carry one-half pound, stand and/or walk for less than two hours per day, sit for less than six hours per day, and that she was limited in pushing and pulling. (Admin. R. at 279.) In other words, he opined that Pisapia was unable to work at even the sedentary level. *See* 20 C.F.R. § 404.1567(a) (defining sedentary work). Pisapia contends that the ALJ was obligated to give controlling weight to Dr. Lazzara's opinion because it was corroborated by a number of diagnostic tests – lumbar and cervical spine MRIs and a nerve conduction study – that were indicative of spinal disorders and radiculopathy. (Admin R. at 266–69, 406–12, 558–59; Pl.'s Mem. at 14.)

Pursuant to the regulations, the ALJ acknowledged that Dr. Lazzara was Pisapia's treating physician and examined evidence both for and against his opinion. (Admin. R. at 16–17.) The ALJ noted that Dr. Lazzara's diagnoses of back pain and muscle disorder were corroborated by Pisapia's April 2012 cervical and lumbar spine MRIs and her November 2012 bone scan. (*Id.* at 16.) Accordingly, the ALJ concluded that Pisapia could only "occasionally climb ramps, stairs, balance, stoop, kneel, crouch; [could not] climb ladders, ropes, or scaffolds; with no exposure to unprotected heights or moving machinery, including driving . . . ." (*Id.* at 15, 16.) The ALJ also noted that Dr. Chow's examination, Dr. Massey's examination, Pisapia's

October 2011 X-rays, Pisapia's April 2012 EMG, Dr. Cummins' opinion, and Dr. Stockton's opinion were contrary to Dr. Lazzara's assessment. (*Id.* at 16–17.) For this reason, the ALJ gave "little weight" to Dr. Lazzara's opinion when determining Pisapia's RFC. (*Id.* at 17.)

The reports cited by the ALJ constitute substantial evidence that contradicts Dr. Lazzara's opinion. *See Veino*, 312 F.3d at 588 (holding that a treating physician's opinion "need not be given controlling weight where [it is] contradicted by other substantial evidence in the record"). Dr. Chow opined that Pisapia had only mild limitations regarding her ability to lift, carry, walk, and climb stairs. (Admin. R. at 16, 318.) Cervical spine x-ray results from October 2011 showed no acute pathology, while left knee x-ray results showed no gross fracture/dislocation and minimal degenerative changes within the lateral tibiofemoral compartment. (*Id.* at 16, 542–43.) April 2012 EMG results and May 2012 brain MRI results both were unremarkable. (*Id.* at 16, 302–05, 401.) In July 2013, Dr. Cummins opined that Pisapia's complaints of physical pain likely were manifestations of depression and anxiety. (*Id.* at 17, 572.) In October 2013, Dr. Manyam concluded that Pisapia had no limitations regarding physical activities. (*Id.* at 16, 386.) In addition, Pisapia's father's Function Report indicated that Pisapia could provide the full range of childcare, shop for food and clothes, drive a car, read to her son, and use a computer. (*Id.* at 17, 241–48.) Moreover, Dr. Stockton's consultative opinion indicated that Pisapia could travel alone, perform household chores, and shop. (*Id.* at 17, 322–23.)

Pisapia contends that because Dr. Manyam and Dr. Chow were consultative physicians, the ALJ was not justified in relying on their opinions to discount Dr. Lazzara's. (Pl.'s Mem. at 14.) This claim lacks merit. The Second Circuit has noted that reports of consultative physicians can constitute substantial evidence, which the ALJ may consider in discounting a treating

physician's opinion. *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011); *Weathers*, 2017 U.S. Dist. LEXIS 5933, at *9 ("It is well established that the report of a consultative physician may constitute substantial evidence.") (citing *Mongeur*, 722 F.2d at 1039); *cf. Burgess v. Astrue*, 537 F.3d 117, 128–29 (indicating that it would be reasonable to discount a consultative physician's opinion if, for example, the physician "did not examine the claimant and relied only on an evaluation by a non-physician reporting inconsistent results"). Especially where a consultative physician's opinion is corroborated by a significant amount of other medical evidence in the record, the ALJ is justified in relying on it. *Weathers*, 2017 U.S. Dist. LEXIS 5933, at *9–10 (citing *Selian*, 708 F.3d at 419).

Here, the consultative physician's reports were corroborated by each other, by the various diagnostic tests cited by the ALJ, by Dr. Cummins' opinion, by Dr. Stockton's opinion, and by Pisapia's father's Function Report. *See Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) (holding that a patient's history, in addition to medical evidence, is an essential diagnostic tool in determining disability). Moreover, Drs. Manyam and Chow directly examined Pisapia. (Admin R. at 315–21, 377–80.) As such, the ALJ was justified in including the consultative opinions when she determined that substantial evidence contradicted Dr. Lazzara's opinion. Although the diagnostic tests cited by Pisapia could have been construed to support Dr. Lazzara's opinion, the record does not "meet the threshold of establishing that there was not substantial evidence to support a contrary determination." *Martin v. Shalala*, No. 93-CV-898S (WMS), 1995 U.S. Dist. LEXIS 4895, at *37 (W.D.N.Y. Mar. 20, 1995); *see also Cichoki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (holding that although a medical source statement provided some support for plaintiff's claim, the court's inquiry should be whether substantial evidence supported the ALJ's decision). The ALJ presented substantial evidence that

contradicted the treating physician's assessment. *See Veino*, 312 F.3d at 588. For the portions of Dr. Lazzara's opinion that were supported in the record (diagnoses of back pain and muscle disorder), the ALJ described how she would incorporate them into Pisapia's RFC. (Admin. R. at 16.) Without "slavish[ly] recit[ing] [] each and every factor," the ALJ acknowledged the treating physician's report and proffered an adequate explanation for why she was discounting his opinion. *Atwater*, 512 F. App'x at 70; *Snell*, 177 F.3d at 134; (Admin. R. at 16). Consequently, the ALJ did not violate the treating physician rule.

### III.    The ALJ's RFC Determination Was Supported by Substantial Evidence

#### a.    Pisapia's Physical RFC

Pisapia contends that the ALJ's RFC determination is not supported by substantial evidence. (Pl.'s Mem. at 15.) The ALJ concluded that Pisapia had the RFC to "occasionally climb ramps, stairs, balance, stoop, kneel, crouch; [could not] climb ladders, ropes, or scaffolds; with no exposure to unprotected heights or moving machinery, including driving . . . ." (Admin R. at 15.) In doing so, the ALJ gave "little weight" to Dr. Lazzara's opinion, and "some weight" to Dr. Manyam's opinion, Dr. Chow's opinion, and Pisapia's father's Function Report. (*Id.* at 16–17.)

The ultimate issue of disability is reserved for the Commissioner, who is not obligated to credit a doctor's finding of disability. *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999); *see also Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.") (citing *Richardson*, 402 U.S. at 389 ("We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has

the duty to resolve that conflict.")). It is not the job of the reviewing courts to "resolve evidentiary conflicts and to appraise the credibility of witnesses . . . ." *Weathers v. Colvin*, No. 3:15-CV-575 (FJS), 2017 U.S. Dist. LEXIS 5933, at \*10–11 (N.D.N.Y. Jan. 17, 2017) (citing *Carrol v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)). As such, the ALJ was justified in determining Pisapia's RFC based on the record as a whole. *See Matta*, 508 F. App'x at 56. Substantial evidence supports ALJ Sedaca's conclusions regarding Pisapia's physical limitations.

### b. Pisapia's Mental RFC

With regard to Pisapia's mental abilities, the ALJ concluded that she was "limited to simple, routine, repetitive tasks with only occasional changes in the work setting including procedures and tools; with only occasional decision-making required; only occasional contact with co-workers; and no contact with the public." (Admin. R. at 15.) In doing so, the ALJ incorporated Dr. Cummins's account of Pisapia's anxiety in crowds. (*Id.* at 16.) Accordingly, the ALJ determined that Pisapia was limited in her capacity to concentrate and interact with others. (*Id.*) The ALJ also noted the fact that Dr. Cummins assigned Pisapia a GAF score of 60, which the ALJ considered representative of only mild-to-moderate limitations. (*Id.*) As noted by the ALJ, Dr. Massey also opined that Pisapia's psychological limitations were mild-to-moderate. (*Id.* at 17.) The ALJ also noted Dr. Stockton's consultative report, which indicated that Pisapia was able to travel alone, complete chores, sustain attention/concentration, interact appropriately with co-workers/supervisors, and adapt to changes in the work environment. (*Id.*) Finally, the ALJ further noted that Pisapia's father's Function Report supported the notion that Pisapia was able to focus attention and concentrate. (*Id.*)

Pisapia alleges that the ALJ did not account for her difficulties with traveling, managing stress, fatigue, lack of motivation, and tendency to become overwhelmed. (Pl.'s Mem. at 16.) Of these purported limitations, the only one that the ALJ rejected outright was Pisapia's claim that she was unable to take public transportation. (Admin. R. at 15.) Pisapia alleges that because Dr. Cummins noted that her agoraphobia was an obstacle to traveling to and from work, the ALJ was obligated to conclude the same. (Pl.'s Mem. at 15–16.) However, both Dr. Manyam and Dr. Stockton opined that Pisapia was capable of using public transportation. (Admin. R. at 323, 386.) "We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict." *Richardson*, 402 U.S. at 389. Here, substantial evidence supports the ALJ's mental RFC determination.

## IV. Substantial Evidence Supports the ALJ's Finding that Pisapia Was Capable of Performing a Significant Number of Jobs in the National Economy

At step five of the disability analysis, the ALJ must consult the applicable Medical Vocational Guidelines found at 20 C.F.R. Part 404, Subpart P, Appendix 2. *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986). However, where, as here, a claimant has both exertional and nonexertional impairments, the ALJ is entitled to rely on the opinion of a vocational expert. *See Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir. 1983). An ALJ may rely on a vocational expert to determine whether there is work that exists in significant numbers in the national economy that a claimant could perform, given his vocational factors and RFC. *Id.*

In this case, the ALJ appropriately relied on VE Marian Green's testimony when she concluded that work that Pisapia could perform existed in significant numbers in the national economy. (Admin. R. at 13, 19.) Therefore, the ALJ's conclusion that Pisapia was not entitled to DIB or SSI is supported by substantial evidence in the record.

## CONCLUSION

For the reasons set forth above, the Commissioner's motion is granted, and Pisapia's motion is denied.   The Clerk of Court is directed to enter judgment accordingly, and close the case.

SO ORDERED.

Dated: Brooklyn, New York
   September 26, 2017

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge